[No. 63491-2.  En Banc.]
Argued May 31, 1996.     Decided December 26, 1996.

ANDERSON & MIDDLETON LUMBER COMPANY, *Respondent*, v. QUINAULT INDIAN NATION, *Petitioner*.

*Richard Reich*; and *Nielsen & Acosta*, by *Eric J. Nielsen*, for petitioner.

*Smith & Leary*, by *John J. Leary, Jr., James R. Hennessey*, and *Connie K. Haslam*, for respondent.

SMITH, J. — The Quinault Indian Nation appeals a decision by the Court of Appeals, Division Two, which affirmed summary judgment by the Grays Harbor County Superior Court in favor of Anderson & Middleton Lumber Company in a partition and quiet title action involving eighty acres of property located within the borders of the Quinault Indian Reservation. We affirm.

## QUESTION PRESENTED

The sole question presented in this case is whether the Grays Harbor County Superior Court retained jurisdiction over an action to partition and quiet title to fee-patented lands located within the Quinault Indian Reservation filed by Anderson & Middleton Lumber Company against ten individual owners after the Quinault Indian Nation acquired the interests of the individual owners and was substituted as defendant.

## STATEMENT OF FACTS

Respondent Anderson & Middleton Lumber Company (A&M) filed suit on January 15, 1992 in Grays Harbor County Superior Court to partition and quiet title to an 80-acre parcel of property located within the borders of the Quinault Indian Reservation. On the same day it filed and recorded a lis pendens to provide record notice of the action. A&M owns, in fee simple, an undivided five-sixths

interest in the surface estate and an undivided one-half interest in the mineral estate of the property. At the time suit was filed, the remaining one-sixth interest in the surface estate and one-half interest in the mineral estate were owned by ten individuals as tenants-in-common with A&M. The United States holds in trust for two of the ten individuals two separate one-ninth interests in the mineral estate. The complaint filed by A&M named the ten individuals as defendants, but did not name the United States as a party. All named defendants were properly served.

The property in question was formerly tribal land held in trust by the United States with federal restrictions on alienation. It acquired its fee simple status in 1958 when the United States issued a "fee patent" conveying ownership to the heirs of one Elliot Peterson. The "fee patent" was issued under the Indian General Allotment Act of 1887 (GAA) and removed all restrictions on conveyance or encumbrance of the property. A&M began purchasing interests in the property in 1965 and by 1988 had acquired its present ownership share. That ownership share, along with the fractional interest owned by the ten individuals at the time of A&M's partition action, are not in dispute in this appeal.

On or about February 24, 1992, more than one month after the lawsuit was filed, the Quinault Indian Nation (Nation) acquired by statutory warranty deeds from the ten individuals their undivided one-sixth fee interest in the surface estate of the property. The statutory warranty deeds transferring title of the surface estate to the Nation stated specifically that the transfer to the Nation was subject to the pending suit filed by A&M and the lis pendens. The Nation concedes it had actual notice of the lawsuit when it purchased its interest in the surface estate of the property.

After transfering their interest to the Nation, the ten former owners moved for their dismissal as defendants and substitution of the Quinault Nation as defendant in

the lawsuit. The trial court, the Honorable Gordon Godfrey, granted the motion. It also ordered A&M to serve a copy of the order on the Nation. The Nation then filed a notice of special appearance to contest, among other things, the court's assumption of jurisdiction.

A&M then filed a motion for summary judgment. The Nation filed a motion to dismiss and a response to the motion for summary judgment, arguing that the court did not have personal or subject matter jurisdiction and that A&M had not joined the United States as an indispensable party. The trial court then granted the Nation's motion, concluding that the Nation enjoyed protection from suit under the doctrine of sovereign immunity. It issued an order dismissing the Nation as defendant and reinstating the original defendants under CR 60(b).

But on a motion for reconsideration, the trial court reversed itself and granted A&M's motion for summary judgment and ordered the surface estate of the property partitioned under RCW 7.52 *et seq*. The court ruled it had in rem jurisdiction over the property and personal jurisdiction over the Nation because the Nation had waived its immunity "[b]y implication and action." It also ruled the United States was not an indispensable party to the action because the suit was to partition and quiet title to only the surface estate and not to the mineral estate.

The Nation appealed the ruling of the Superior Court. The Court of Appeals, Division Two, affirmed, holding that the trial court did have proper jurisdiction to decide the case.[1] Without addressing the issue of waiver, the court concluded the trial court had personal jurisdiction over the Nation, reasoning that once jurisdiction properly attached, it continued after substitution of parties. The court also agreed with the trial court that because A&M's suit was to partition and quiet title to the *surface estate* of the property, and not to the *mineral estate*, the United States

---

[1]*Anderson & Middleton Lumber Co. v. Quinault Indian Nation*, 79 Wn. App. 221, 901 P.2d 1060 (1995).

was not an indispensable party to the suit. However, the court did not rule on the issue of in rem jurisdiction.

The Nation now appeals the decision by the Court of Appeals. It argues that the trial court erred in entering summary judgment in A&M's favor because the court did not have personal or subject matter jurisdiction over the law suit. It also argues the court did not have jurisdiction because the United States was not joined as an indispensable party.[2]

## DISCUSSION

### INTRODUCTION

Through a succession of congressional land enactments passed during the latter part of the nineteenth century, this nation's policy of sequestering land for the exclusive use and control of Indian Tribes was replaced by a policy of allotting those lands to individual tribal members.[3] The general purpose behind the allotment policy was to abolish tribal sovereignty and the communal reservation system and thus force Indian assimilation into general society by breaking up tribal relations.[4]

The Indian General Allotment Act of 1887, as amended and codified in 25 U.S.C. §§ 331 *et seq.*, was one of the land acts furthering Congress' allotment policy. The GAA empowered the President of the United States to allot tribal lands nationwide to individual Indian allottees without consent of the affected Indian Nations. Upon approval of an allotment under the Act, a trust patent would issue to an Indian allottee, declaring that the allotted

---

[2]A&M argues the trial court's ruling was not a final judgment appealable as a matter of right under RAP 2.2. This argument is without merit. The trial court's order to partition the surface estate of the property was a final judgment appealable as a matter of right.

[3]*See, e.g., In re Heff,* 197 U.S. 488, 25 S. Ct. 506, 509, 49 L. Ed. 848 (1905), *overruled by United States v. Nice,* 241 U.S. 591, 36 S. Ct. 696, 699, 60 L. Ed. 1192 (1916).

[4]*See In re Heff,* 25 S. Ct. at 508.

land would be held by the United States in trust for a period of twenty-five years or longer.[5] During the trust period, allotted parcels were held "for the sole use and benefit of the Indian to whom such allotment shall have been made," but restrictions on alienation of the land remained in effect.[6] Upon expiration of the trust period, a fee patent would then issue to the Indian allottee removing "all restrictions as to sale, encumbrance, or taxation of said land."[7] The GAA also provided that upon issuance of the fee patent, "each and every allottee shall have the benefit of *and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside.*"[8] The latter provision served to further Congress' goal of Indian assimilation.[9]

■ The policy of allotting tribal lands proved to be "disastrous for the Indians," as well as "administratively unworkable and economically wasteful."[10] In response to this failed policy, Congress in 1934 passed the Indian Reorganization Act and brought the era of allotment to a close. The Act, codified in 25 U.S.C. §§ 461 *et seq.*, marked a return to the pre-GAA policy of tribal self-governance by proscribing any further allotments and extending indefinitely any trust periods then existing under a trust patent.[11] The Act also authorized the return to tribal ownership of any unallotted surplus Indian lands.[12] "Except by authorizing reacquisition of allotted lands in trust, however, Congress made no attempt to undo the

---

[5]25 U.S.C. § 348.

[6]*Id.*

[7]*Id.* at § 349.

[8]*Id.* (emphasis added).

[9]*County of Yakima v. Yakima Indian Nation*, 502 U.S. 251, 112 S. Ct. 683, 686, 116 L. Ed. 2d 687 (1992).

[10]*Hodel v. Irving*, 481 U.S. 704, 107 S. Ct. 2076, 2079, 95 L. Ed. 2d 668 (1987) (citation omitted).

[11]*See* 25 U.S.C. §§ 461, 462.

[12]25 U.S.C. § 463.

dramatic effects of the allotment years on the ownership of former Indian [now fee patented] lands. It neither imposed restraints on the ability of Indian allottees to alienate or encumber their fee-patented lands, *nor impaired the rights of those non-Indians who had acquired title to over two-thirds of the Indian lands allotted* under the [GAA]."[13] Even reacquisition by an Indian tribe of fee patented lands does not then reinstate the former restrictions on alienation or encumbrance of the lands.[14]

The Quinault Indian Reservation was established by the Treaty with the Qui-nai-elts in 1859, otherwise known as the "Treaty of Olympia."[15] The Quinault Indian Nation is the federally recognized governing body on the Quinault Indian Reservation.[16] The allotment process began on the Reservation in 1905. By 1934, when Congress halted all further allotments of tribal lands, approximately 2,340 trust allotments had been issued.[17]

*JURISDICTION*

## In Rem Jurisdiction

The trial court concluded it had in rem jurisdiction over A&M's lawsuit. That conclusion is in accord with the language of the GAA and the United States Supreme Court's decision in *County of Yakima v. Yakima Indian Nation.*[18]

In *County of Yakima*, the county sought to foreclose on properties located within the confines of the Yakima Indian Reservation for failure to pay ad valorem taxes on

---

[13]*County of Yakima*, 112 S. Ct. at 686-87 (emphasis added).

[14]*Lummi Indian Tribe v. Whatcom County, Wash.*, 5 F.3d 1355, 1358-59 (9th Cir. 1993), *cert. denied*, 114 S. Ct. 2727 (1994).

[15]Treaty with the Qui-nai-elts, April 11, 1859, 12 Stat. 971.

[16]*See United States v. Washington*, 384 F. Supp. 312, 374 (D.C. Wash. 1974).

[17]*See Quinault Allottee Assoc. v. United States*, 485 F.2d 1391, 1395 (Ct. Cl. 1973). *cert denied*, 416 U.S. 961 (1974).

[18]*County of Yakima v. Yakima Indian Nation*, 112 S. Ct. 683.

the properties and excise taxes on their sale.[19] Like the parcel in question in this case, the properties in dispute in *County of Yakima* were fee patented under the GAA and owned by members of the Yakima [Yakama] Indian Nation and, in some cases, by the Nation itself.[20] The properties were located on those portions of the Reservation lying within the boundaries of Yakima County.[21] Under Washington law, the county imposed an ad valorem levy on taxable real property within its jurisdiction and an excise tax on sales of the same land.[22] Upon foreclosure by the county of properties for which taxes were past due, the Yakima [Yakama] Nation filed suit contending, among other things, that state jurisdiction could not be asserted over reservation fee patented lands.

The Court ruled against the Nation and upheld imposition of the county's ad valorem taxes on fee patented reservation land, but did not allow the county to enforce its excise tax on sales of that land.[23] The Court reached that conclusion by reasoning that the GAA provided express statutory authority to impose the ad valorem tax in section 6 of the GAA.[24] Section 6 (25 U.S.C. § 349) provides in relevant part:

> At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, . . . then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside . . . . *Provided*, That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in

---

[19]*County of Yakima*, 112 S. Ct. at 687.

[20]*Id.*

[21]*Id.*

[22]*Id.*

[23]*Id.* at 694.

[24]*Id.* at 688.

fee simple, and thereafter all restrictions as to sale, encumbrance, *or taxation of said land* shall be removed[.]

(Emphasis added.)

The Court concluded the ad valorem tax "flow[ed] exclusively from ownership of realty" and thus qualified as *taxation of land*.[25] Cognizant of its duty to construe statutes "liberally in favor of the Indians," however, the Court interpreted the ambiguous provision "taxation of . . . land" to exclude the county excise tax because it taxed the *transaction* of selling land, and did not tax the land itself.[26]

■ The Court upheld assertion by the Washington court of jurisdiction to authorize county taxes on allotted fee properties on the basis *of alienability of the allotted lands* and not on the basis of jurisdiction over their Indian owners.[27] It specifically characterized the state's jurisdiction as in rem, rather than in personam.[28] The Court reasoned that once the allotted lands became alienable and encumberable under section 5 of the Act (25 U.S.C. § 348),[29] those lands also became subject to assessment and forced sale for taxes.[30]

The Supreme Court distinguished the *County of Yakima* case from its 1976 decision in *Moe v. Confederated Salish & Kootenai Tribes*. In *Moe*, the Court concluded that the GAA's section 6 conferral to the states of in personam jurisdiction over fee patent recipients could not extend to

[25]*Id.* at 692-93.

[26]*Id.* at 693-94.

[27]*Id.* at 690-91.

[28]*Id.* at 691.

[29]Section 5 of the GAA (25 U.S.C. § 348) provides in part that "at the expiration of said [trust] period the United States will convey [the allotted lands] by patent to said Indian . . . in fee, discharged of said trust and free of all charge or encumbrance whatsoever . . . ."

[30]*County of Yakima*, 112 S. Ct. at 691.

subsequent Indian owners of those allotted fee lands.[31] Such an approach, the Court reasoned in *Moe*, would conflict with post-allotment era legislation and create an "impractical pattern of checkerboard jurisdiction" in which an individual tribal member's subjection to state jurisdiction would depend upon parcel ownership.[32] Thus, the Court did not extend the section 6 grant of in personam jurisdiction beyond the provision's literal coverage of "each and every [original Indian] allottee."[33] But in *County of Yakima*, the Court observed that Yakima County's assertion of jurisdiction to tax reservation fee patented land would not create the "checkerboard" effect condemned in *Moe* because its jurisdiction was in rem and not in personam.[34] The ad valorem tax was upheld by the Court as an assertion of jurisdiction over the *allotted land*, and not over the person of its Indian owners.[35]

In this case, A&M's quiet title and partition action involves a much less intrusive assertion of state jurisdiction over reservation fee patented land than was involved in *County of Yakima*. The county in that case had exercised its power to tax and foreclose on allotted fee lands, some of which were owned by the Yakima [Yakama] Nation itself, located within the confines of a reservation. A&M's action in this case involves no taking of property. It merely seeks a judicial determination of the co-tenants' relative interests in real property and a division of that

---

[31]*Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S. Ct. 1634, 1643-44, 48 L. Ed. 2d 96 (1976).

[32]*See Moe*, 96 S. Ct. at 1643-44; *see also County of Yakima*, 112 S. Ct. at 690 (interpreting *Moe*).

[33]*See Moe*, 96 S. Ct. at 1643-44.

[34]*County of Yakima*, 112 S. Ct. at 691.

[35]*See United States ex rel. Saginaw Chippewa Tribe v. Michigan*, 882 F. Supp. 659, 668-69 (E.D. Mich. 1995) (noting that the ad valorem tax at issue in *County of Yakima* was upheld as a tax on land, while the excise tax was struck down as a tax imposed *on the person, for the person's actions*).

property according to those interests.[36] The Quinault Nation would lose no property or interest for which it holds legal title.

▌Under the Supreme Court's holding in *County of Yakima*, it is reasonable to conclude that the Grays Harbor County Superior Court had proper in rem jurisdiction over A&M's suit to quiet title and partition alienable and encumberable fee patented property situated within the Quinault Indian Reservation. The right of partition by a tenant-in-common of real property is absolute in Washington,[37] and is governed by statute in RCW 7.52. An action for partition of real property is a proceeding in rem.[38]

It is not disputed that the trial court had proper jurisdiction over this action when it was filed. The subsequent sale of an interest in the property to an entity enjoying sovereign immunity (Quinault Nation) is of no consequence in this case because the trial court's assertion of jurisdiction is not over the entity in personam, but over the property or the "res" in rem. Because the res or property is alienable and encumberable under a federally issued fee patent, it should be subject to a state court in rem action which does nothing more than divide it among its legal owners according to their relative interests. Reacquisition of a portion of the land by a federally recognized Indian tribe does not alter this result because tribal reacquisition of fee land does not affect the land's

---

[36]*See* RCW ch. 7.52; *Schultheis v. Schultheis*, 36 Wn. App. 588, 589 n.1, 675 P.2d 634, *review denied*, 101 Wn.2d 1016 (1984); 59A Am. Jur. 2d *Partition* § 1 (1987).

[37]*Hamilton v. Johnson*, 137 Wash. 92, 100, 241 P. 672 (1925).

[38]*See Chapman v. Vande Bunte*, 604 F. Supp. 714, 715 (E.D. N.C. 1985) (partition action a proceeding in rem); *In re Braun v. Champion Credit Union*, 141 B.R. 133, 137 (Bankr. N.D. Ohio 1992) (partition of real property an in rem proceeding); *In re Green River Drainage Area*, 147 F. Supp. 127, 139 (D. Utah 1956) (same); 59A Am. Jur. 2d *Partition* § 100 (1987) (partition action a proceeding in rem/quasi in rem); *see also Phillips v. Tompson*, 73 Wash. 78, 82, 131 P. 461 (1913) (action to quiet title to real property a proceeding in rem); *Cline v. Price*, 39 Wn.2d 816, 821, 239 P.2d 322 (1951) (admiralty case) (suit for partition a proceeding in rem).

alienable status.[39] This conclusion is consistent with *County of Yakima.*

The Quinault Nation argues that *County of Yakima* requires a finding in this case of express statutory authority in the GAA granting state jurisdiction over actions involving reservation fee patented lands. But the Nation interprets that case too narrowly. Citing Chief Justice Marshall's admonition that "the power to tax involves the power to destroy," the Court observed that the special area of state taxation of reservation lands and reservation Indians requires express congressional authorization.[40] The Court also added that, while the provision removing "all restrictions as to sale, encumbrance, or taxation of [fee patented reservation] land" describes a state's entire range of "*jurisdiction to tax*" allotted land, it does not purport to describe the entire range of a state's in rem jurisdiction over such land.[41]

The United States Court of Appeals for the Ninth Circuit rejected the same argument in a case involving facts similar to those in *County of Yakima.* In *Lummi Indian Tribe v. Whatcom County,* the Court applied the holding in *County of Yakima* to a case involving state taxation of fee land held by an Indian tribe.[42] The land in dispute in *Lummi* acquired its fee status not under the GAA but under a treaty which contained no express provision allowing for state taxation of the land.[43] With no clear statutory authorization, the Court of Appeals upheld a county-imposed ad valorem tax on the reservation fee

---

[39]*Lummi Indian Tribe v. Whatcom County,* 5 F.3d 1355, 1359 (9th Cir. 1993) (holding that "parcels of [reservation] land approved for alienation by the federal government and then reacquired by the Tribe did not then become inalienable . . . ."), *cert denied,* 114 S. Ct. 2727 (1994).

[40]*County of Yakima,* 112 S. Ct. at 688 (citation omitted).

[41]*Id.* at 691, 693.

[42]*Lummi,* 5 F.3d at 1355.

[43]*Id.* at 1356-57, 1360.

patented land.[44] In reaching that conclusion, the court noted that the *County of Yakima* holding (which focused on alienability as a basis for state taxation of Indian land) was difficult to square with the rule, approved by the Supreme Court in that case, requiring clear congressional intent to authorize state taxation of Indians.[45] It concluded, however, that despite this apparent inconsistency, "[t]he strength of the language in [*County of Yakima*]" required an interpretation of that case as standing for the rule that alienable Indian land is taxable Indian land.[46]

There is some textual support in the GAA for state court jurisdiction over partition proceedings involving reservation fee land. Section 5 of the Act (§ 348) provides in relevant part that "the law of descent and *partition* in force in the State or Territory where such [allotted] lands are situate shall apply thereto after patents therefor have been executed and delivered . . . ."[47] While this language is not dispositive, it is reasonable to conclude that a state court has jurisdiction to apply its substantive law of partition to reservation fee patented land. A broad statutory grant of in rem state jurisdiction over fee patented lands can be concluded from the Supreme Court decision in *County of Yakima.*

The Nation also contends that, regardless whether the trial court had in rem jurisdiction over the property, the real issue in this case is whether the Nation waived its sovereign immunity. This argument ultimately leads to the proposition that in rem jurisdiction alone is not sufficient to extend the State's authority to partition suits involving reservation fee patented land. Under that theory, this court would have to determine that the trial court acquired in personam jurisdiction over the Nation, as well as in rem jurisdiction over the property, to uphold its as-

---

[44]*Id.* at 1359.

[45]*Id.* at 1358.

[46]*Id.*

[47]25 U.S.C. § 348 (emphasis added).

sertion of jurisdiction in this case. But the decision in *County of Yakima*, which based state jurisdiction to tax and foreclose on reservation fee land exclusively *in rem*, contradicts that contention.[48]

## *Personal Jurisdiction*

A&M claims the trial court had personal jurisdiction over the Nation, as well as in rem jurisdiction over the property in dispute in this action. In support of that contention it argues that the Nation waived its sovereign immunity by purchasing property it knew was burdened by a pending partition action. It also argues that once a court properly acquires jurisdiction over a matter, that jurisdiction continues irrespective of any subsequent change of parties.

As sovereign entities, Indian tribes are immune from suit in state or federal court.[49] It is well settled that waiver of their sovereign immunity will not be implied, but must be unequivocally expressed.[50] However, a tribe enjoying immunity need not articulate waiver of that protection by specific language. For example, courts have found express waiver of sovereign immunity by Indian tribes merely by their initiating or intervening in a law suit.[51] Because our decision is based upon in rem jurisdiction, we need not further consider in personam jurisdiction, immunity and

---

[48]*See also Saginaw Chippewa Tribe,* 882 F. Supp. at 664, 668-677 (holding under *County of Yakima* that Indian-owned fee lands located within a reservation were subject to state taxation when rendered alienable encumberable under a federally issued fee patent, irrespective of state in personam jurisdiction over its Indian owners); *Leech Lake Band v. Cass County,* 908 F. Supp. 689, 697 (D. Minn. 1995) (holding under *County of Yakima* that fee land rendered alienable under the GAA and subsequently reacquired by an Indian tribe was nonetheless subject to state property taxation).

[49]*McClendon v. United States,* 885 F.2d 627, 629 (9th Cir. 1989).

[50]*See, e.g., North Sea Prods. v. Clipper Seafoods Co.,* 92 Wn.2d 236, 241, 595 P.2d 938 (1979) (citing cases).

[51]*See United States v. State of Oregon,* 657 F.2d 1009, 1014-16 (8th Cir. 1981) (tribe waived sovereign immunity by intervening in a law suit); *McClendon,* 885 F.2d at 630 ("Initiation of a lawsuit necessarily establishes [tribal] consent to the court's adjudication of the merits of that particular controversy.").

waiver. Besides, there was not sufficient briefing and argument on the issue to convince us of its relevance.

## Subject Matter Jurisdiction

The Nation also claims the trial court did not have subject matter jurisdiction over A&M's partition action after the Nation acquired its interest in the property. In support of that contention it offers the Indian Nonintercourse Act, codified in 25 U.S.C. § 177. Section 177 of the Act provides that

> No purchase, grant, lease or other conveyance of lands or of any title or claim thereto, from an Indian Nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

The Nation argues that when it purchased its interest in the property, that interest became subject to the Act's restriction against alienation. Therefore, it reasons, state law affecting its property interest is preempted by the Act. We do not agree.

██ The Nonintercourse Act is not applicable to this case. First, the Act, by its plain terms, applies to land acquired *from* Indian tribes, and not acquired *by* Indian tribes.[52] Second, once the United States removes restraints on alienation of Indian land, as it did here under a fee patent, the protections of the Nonintercourse Act no longer apply.[53] Reacquisition of the land by the Nation does not change this result since "parcels of [Indian] land approved for alienation by the federal government and then

---

[52]*Saginaw Chippewa Tribe*, 882 F. Supp. at 674.

[53]*Lummi*, 5 F.3d at 1359; *Saginaw Chippewa Tribe*, 882 F. Supp. at 674; *Leech Lake Band*, 908 F. Supp. at 694-95 (citing *Lummi* and *Saginaw Chippewa Tribe*).

reacquired by the Tribe [do] not then become inalienable by operation of the Nonintercourse Act."[54]

## *Joinder of a Necessary Party*

The Nation argues the trial court did not have jurisdiction over A&M's lawsuit because A&M did not join the United States as an indispensable party, it being the equitable owner of an interest in the property's mineral estate. This argument is without merit.

▮ Although A&M did not specify in its complaint that it sought to partition only its rights in the surface estate of the property, this point was made clear when it filed its response to the Nation's motion to dismiss. The trial court considered the pleading as amended, under CR 15(b),[55] and ordered partition of the surface estate, but not of the mineral estate. Because the action was thus limited to a determination of the parties' relative interests in the *surface estate* of the property, and not of the *mineral estate*, the United States was not an indispensable party to the lawsuit.

## POLICY

The Nation argues that assertion of state jurisdiction over this case conflicts with the federal policy of preserving the Nation's tribal integrity and land base. It offers as evidence of this policy the Indian Reorganization Act. However, the Supreme Court in *County of Yakima* rejected a similar argument offered by the Yakima [Yakama] Indian Nation.

In *County of Yakima*, the Yakima [Yakama] Indian Na-

---

[54]*Lummi*, 5 F.3d at 1359.

[55]CR 15(b) provides in relevant part, "When issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." This provision is to be liberally construed. *Amende v. Pierce County*, 70 Wn.2d 391, 400, 423 P.2d 634 (1967).

tion argued that state jurisdiction over reservation fee land was "manifestly inconsistent with the policies of Indian self-determination and self-governance that lay behind the Indian Reorganization Act and subsequent congressional enactments."[56] The Court responded that this claim was "a great exaggeration," reasoning that while state exercise of in personam jurisdiction might prove disruptive of tribal self-governance, "the mere power to assess and collect a tax on certain real estate is not."[57] It also added that

> In any case, these policy objections do not belong in this forum. If the Yakima Nation believes that the objectives of the Indian Reorganization Act are too much obstructed by the clearly retained remnant of an earlier policy, it must make that argument to Congress.[58]

It is not for the courts to cure the effects of two seemingly conflicting policies embodied in federal statutory law. If the Quinault Nation believes the policy objectives of the Indian Reorganization Act are frustrated by the GAA or other allotment-era legislation, it should address that concern to the Congress and not to the courts. We reach no determination on it in this case.

## SUMMARY AND CONCLUSIONS

The trial court ruled it had both in rem jurisdiction over the property and in personam jurisdiction over the parties in A&M's partition suit. It reached the latter conclusion by reasoning that the Quinault Nation had waived its sovereign immunity by purchasing property it knew was the subject of a pending law suit. The Court of Appeals affirmed that decision, holding that the trial court's assertion of personal jurisdiction over the parties, properly acquired at the outset of the suit, continued over

---

[56]*County of Yakima*, 112 S. Ct. at 692.

[57]*Id.*

[58]*Id.*

a substituted party. The Court of Appeals did not address the issue of waiver of sovereign immunity, nor did it address the trial court's claim of in rem jurisdiction. While we affirm the decision of the Court of Appeals, we do so for a different reason.

The Grays Harbor County Superior Court had proper in rem jurisdiction over A&M's suit to quiet title and partition the surface estate of real property located within the Quinault Indian Reservation. Because the property became freely alienable under a federally issued fee patent under the Indian General Allotment Act of 1887, it is subject to the trial court's in rem jurisdiction over real property located within the state. The fact that the property is now owned in part by a federally recognized Indian tribal nation does not change this result because the alienable fee status of the land continues under the GAA even if reacquired by an Indian Nation.

The Quinault Indian Nation enjoys immunity from suit as a sovereign entity. Although the Nation did have notice before purchasing its interest in the property that the property was the subject of a pending partition and quiet title action, that conduct does not constitute express waiver or even implied waiver of sovereign immunity from suit. Because of our decision in this case, we make no specific ruling on this issue.

The Grays Harbor County Superior Court had proper in rem jurisdiction over this lawsuit. Although the Indian Nonintercourse Act preempts operation of any state law affecting the ownership of Indian trust land, the protections of the Act do not apply to lands made alienable and encumberable under a federally issued fee patent. Subsequent reacquisition of the land by an Indian tribe does not change this result because the land's alienable status is not altered.

The trial court did not err in denying the Quinault Nation's motion to dismiss for failure to join the United States as an indispensable party. The United States holds in trust two one-ninth interests in the property's mineral

estate for two of the ten original individual owners of the property. A&M sought partition of the surface estate of the property and not of the mineral estate. The United States was thus not an indispensable party.

We do not address whether state jurisdiction over partition actions of reservation fee patented land violates the policies of tribal self-governance behind the Indian Reorganization Act and subsequent legislation. The proper forum for settlement of that dispute is the Congress and not this court.

We affirm the decision of the Court of Appeals, Division Two, affirming assertion by the Grays Harbor County Superior Court of jurisdiction over the suit by Anderson & Middleton Lumber Company to quiet title and partition real property on the Quinault Indian Reservation owned by the company as tenant-in-common with ten individuals and retention by the Superior Court of jurisdiction of the case after the Quinault Indian Nation acquired the individual interests and was substituted as defendant.

DURHAM, C.J., DOLLIVER, GUY, JOHNSON, MADSEN, ALEXANDER, TALMADGE, and SANDERS, JJ., concur.