**QUINAULT INDIAN NATION,**
Plaintiff–Appellant,

v.

**GRAYS HARBOR COUNTY,**
Defendant–Appellee.

No. 01–35219.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 2002.

Filed Nov. 8, 2002.

Richard Reich, Office of the Reservation Attorney, Quinault Indian Nation, Mercer Island, WA, for the plaintiff-appellant.

Jennifer L. Wieland, Grays Harbor County Prosecuting Attorney's Office, Montesano, WA, for the defendant-appellee.

Before: BRUNETTI, TROTT, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge.

This case presents the question whether Congress's intention to permit state taxation of Indian land *unambiguously* encompasses the unique taxation scheme now before us. *See Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 765, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) (states are permitted to tax Indians "only when Congress has made its intention to [permit such taxation] unmistakably clear").

In 1998, the Quinault Indian Nation ("Quinault Nation" or "Nation") purchased approximately 4,500 acres of forest land, most of which was located in Grays Harbor County, Washington ("Grays Harbor" or "the County"). Two years later, the Quinault Nation transferred the land to the United States to hold in trust for the Nation, thereby triggering a $58,000 compensating tax imposed by the County. Under Washington's tax law, land classi-

fied for forest use is assigned a reduced property valuation for property tax purposes. Under certain circumstances, the sale or transfer of forest use land deprives the property of its favorable tax status and triggers the imposition of a tax on the seller-transferor.

Believing that the County lacked federal congressional authority to levy this tax, the Quinault Nation sought declaratory and injunctive relief from the tax in district court. Grays Harbor urged that the tax fell within the scope of permissible state taxation of an Indian tribe. Faced with competing interpretations of the Washington statute, the district court granted summary judgment in favor of Grays Harbor, holding that the tax was a permissible "taxation of land" under the Indian General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.*, as construed by the Supreme Court in *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992).

■ On appeal, our analysis rests on the Court's teaching in *County of Yakima.* As the Supreme Court reminded us in that case, our choice between reasonable constructions of the General Allotment Act "must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: 'Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Id.* at 269, 112 S.Ct. 683 (quoting *Blackfeet Tribe,* 471 U.S. at 766, 105 S.Ct. 2399).

■ The result in this case boils down to whether the tax is characterized as a permissible taxation of land, that is an "ad valorem tax,"[1] or as an impermissible tax more akin to an "excise tax."[2] Fairly characterized, the tax is triggered by the sale or transfer of the property and the amount of the tax is derived from a formula that is a hybrid of market value and tax savings. The tax simply does not fall easily within the ad valorem category. And although the excise tax box may not be a perfect fit, because the transfer of the property triggers the tax, it is more akin to an excise tax than any other. In this nether world of Indian taxation, the ambiguity inherent in this tax scheme tips the balance in favor of the Quinault Nation. Consequently, because the construction is plagued with ambiguity, and because it is not enough to be persuaded that the County's is a permissible or even the better reading, we reverse.

## BACKGROUND

The Quinault Reservation was established by Executive Order in 1873 pursuant to the Treaty with the Quinault. *See* Executive Order of November 4, 1873; 12 Stat. 971. In the century that followed, ownership of tribal lands was on a virtual see-saw. Within fifteen years of establishing the reservation, Congress enacted the General Allotment Act, which permitted the allotment of tribal lands to individual Indians and resulted in the vast majority of reservation land being allotted to individuals. *Indian General Allotment Act of 1887,* 24 Stat. 388, as amended, 25 U.S.C. § 331 *et seq.* In 1934, Congress stepped in to halt further allotment. *Indian Reor-*

---

1. An ad valorem tax is one "imposed on property according to its value." *FDIC v. County of Orange,* 262 F.3d 1014, 1022 (9th Cir. 2001); *see also* Black's Law Dictionary 51 (6th ed. 1990) ("A tax imposed on the value of property.").

2. An excise tax is one "imposed on the performance of an act." Black's Law Dictionary 563 (6th ed.1990).

*ganization Act,* 48 Stat. 984, as amended, 25 U.S.C. § 461 *et seq.* Nonetheless, by the mid–1980s, 30% of the reservation's allotted land had been transferred to non-Indian ownership, with a handful of non-Indian entities owning approximately 80% of these holdings.

As a result of several legislative initiatives to promote tribal land acquisition and economic development, the Quinault Nation undertook to reacquire lands within the reservation, including forest lands. The Nation acquired over 4,500 acres of forest land from Rayonier, Inc., a timber company, in 1998. The vast bulk of the land and the portion at issue in this case— 4,365 acres—is located in Grays Harbor, with the remainder located in a neighboring county. At the time of sale, the Nation signed a "Notice of Continuance," ensuring that the property would retain its forest use classification and, thus, its reduced valuation for property tax purposes.

Pursuant to § 465 of the Indian Reorganization Act, in March 2000 the Quinault Nation applied to have the United States accept title to the 4,500 acres in trust for the Nation, thus removing the land from Washington's tax rolls. *See* 25 U.S.C. § 465 ("Title to any lands ... acquired pursuant to this Act ... shall be taken in the name of the United States in trust for the Indian tribe ..., *and such lands ... shall be exempt from State and local taxation*.") (emphasis added). The Bureau of Indian Affairs approved the application for transfer of title, and notice of the approval was sent to the Grays Harbor Assessor's Office.

Grays Harbor did not object to the transfer, but notified the Nation that the completed transfer would trigger a tax of $58,000 because the transfer was to a tax exempt entity (i.e., the United States). *See* Wash. Rev.Code § 84.33.120(5)(b). Of the $58,000, roughly $10,000 was attribut-

able to tax savings earned by the Nation while it owned the forest land from June 1998 until May 2000; the remainder of the tax ostensibly recouped savings earned by Rayonier in the years preceding the 1998 sale.

The Nation challenged the tax in a declaratory judgment action in federal district court. In ruling on cross-motions for summary judgment, the district court concluded that the compensating tax constituted an ad valorem real property tax of the type approved in *County of Yakima* and thus upheld its imposition under § 6 of the General Allotment Act. The Quinault Nation paid the disputed tax under protest pending the outcome of this appeal.

## DISCUSSION

### I. *COUNTY OF YAKIMA* AND STATE TAXATION OF INDIAN LAND

It is a well established principle of Indian law that state and local governments lack the power to tax reservation Indians or their land " '[a]bsent cession of jurisdiction or other federal statutes permitting it.' " *County of Yakima,* 502 U.S. at 258, 112 S.Ct. 683 (quoting *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)). This general exemption from state taxation is lifted "only when Congress has made its intention to do so unmistakably clear." *Blackfeet Tribe,* 471 U.S. at 765, 105 S.Ct. 2399; *see also Lummi Indian Tribe v. Whatcom County,* 5 F.3d 1355, 1357 (9th Cir.1993). The prohibition on state taxation of Indian tribes has been described as "a *per se* rule." *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 215 n. 17, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).

The Supreme Court applied this principle in *County of Yakima,* where it considered whether Yakima County could impose

an ad valorem tax on Indian-owned reservation fee land and an excise tax on the sales of such land. 502 U.S. at 253, 112 S.Ct. 683. The Court held that the Indian General Allotment Act of 1887, under which the land at issue had been allotted and fee-patented, evinced Congress's clear intent to subject the Yakima Nation's reservation fee land to state real estate taxes. *Id.* at 263–64, 112 S.Ct. 683. The Court reasoned that when the General Allotment Act "rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment ... for taxes." *Id.*; *see also Cass County v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 110–11, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998) ("Congress has manifested such an intent [to permit state taxation] when it has authorized reservation lands to be allotted in fee to individual Indians, thus making the lands freely alienable and withdrawing them from federal protection."); *Lummi Indian Tribe*, 5 F.3d at 1357 ("[N]o matter how the [reservation] land became patented, it is taxable once restraints against alienation expire.").

The Court's conclusion that the Indian land was taxable did not, by itself, determine the extent of permissible state taxation. To resolve that issue, the Court turned to § 6 of the General Allotment Act, 24 Stat. 390, as amended by the Burke Act of 1906, 34 Stat. 182, codified at 25 U.S.C. § 349. Section 6 provides:

> At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, ... then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside .... *Provided*, That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her

> affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or *taxation of said land* shall be removed. . . .

*Id.* (second emphasis added). Significantly, the Court held that the Burke Act proviso "describe[d] the entire range of *jurisdiction to tax.* And that description is 'taxation of ... land.'" *County of Yakima*, 502 U.S. at 268, 112 S.Ct. 683 (emphasis in original).

The Court then assessed whether the two taxes at issue were permissible "taxation of ... land" as contemplated by the Burke Act proviso. Because liability for Yakima County's ad valorem tax "flow[ed] exclusively from ownership of realty on the annual date of assessment" and "create[d] a burden on the property alone," the tax constituted a valid "taxation of ... land." *Id.* at 266, 112 S.Ct. 683.

Yakima County's excise tax on the sale of the Nation's fee land was, however, another matter. Yakima County advocated a reading of the Burke Act proviso that would subject an Indian allotment to wholesale state taxation once the land had been patented in fee. *Id.* at 268, 112 S.Ct. 683. The Court rejected Yakima County's all-encompassing position. In so doing, the Court acknowledged that the county's broad interpretation of "taxation of ... land" "[did] not exceed the bounds of *permissible* construction." *Id.* (emphasis added). Yet, the Court observed, such a construction was "surely not ... the phrase's unambiguous meaning .... It is quite reasonable to say, in other words, that though the object of the *sale* here is land, that does not make land the object of the *tax*, and hence does not invoke the Burke Act proviso." *Id.* at 268–69, 112 S.Ct. 683 (emphasis in original). Employing the canon of construction by which ambiguous

statutory provisions are interpreted to the Indians' benefit, the Court narrowly construed the General Allotment Act, as amended by the Burke Act: Because the "Allotment Act explicitly authorizes only 'taxation of ... land,' not 'taxation with respect to land,' 'taxation of transactions involving land,' or 'taxation based on the value of land,'" the excise tax was invalid as applied to sales of the Yakima Nation's fee land. *Id.* at 269, 112 S.Ct. 683.

Here, like the property at issue in *County of Yakima,* the reservation land transferred by the Nation in trust to the United States was made alienable under the Indian General Allotment Act of 1887. *See Quinault Allottee Ass'n v. United States,* 202 Ct.Cl. 625, 485 F.2d 1391, 1394 (1973) (discussing allotment history on the Quinault Reservation); *Anderson & Middleton Lumber Co. v. Quinault Indian Nation,* 130 Wash.2d 862, 929 P.2d 379, 382–83 (1996) (same). Thus, we must determine whether Grays Harbor's tax qualifies as a "taxation of ... land" of the sort authorized by the General Allotment Act and upheld in *County of Yakima.*

## II. GRAYS HARBOR COUNTY'S COMPENSATING TAX

Washington has created "a special system of taxation for property qualifying for treatment as forest land under its provisions." *Weyerhaeuser Co. v. Cowlitz County,* 109 Wash.2d 363, 745 P.2d 488, 491 (1987). The valuation of land classified for forest use "generally results in a lower rate of taxation for the property than the fair market value ...." *Id.* Property that has been assessed and valued as forest land loses that advantageous tax classification upon the occurrence of one of several events, including the "[s]ale or transfer to an ownership making such land exempt from ad valorem taxation." Wash. Rev.Code § 84.33.120(5)(b).

With the loss of this favorable tax status comes the imposition of the "compensating" tax. *Id.* § 84.33.120(7). Washington courts have described the tax as "equal to any tax savings which had resulted from" the lower rates imposed as a result of the land's favorable tax status during the previous ten years. *Weyerhaeuser,* 745 P.2d at 491 (citing Wash. Rev.Code § 84.33.120(7)); *see also Klassen v. Skamania County,* 66 Wash.App. 127, 831 P.2d 763, 765 (1992). In fact, the tax is not necessarily identical to the land owner's tax savings because the tax is not calculated by merely summing up the tax savings from the previous years. Rather, the tax is equal to:

> the difference, if any, between the amount of tax last levied on such land as forest land and an amount equal to the new assessed valuation of such land multiplied by the dollar rate of the last levy extended against such land, multiplied by a number, in no event greater than ten, equal to the number of years ... for which such land was assessed and valued as forest land.

Wash. Rev.Code § 84.33.120(7). In short, Grays Harbor determines the tax by (1) calculating the tax benefit obtained during the last year that the land was classified for forest use, and (2) multiplying this benefit by the number of years that the land retained the forest use classification, up to a maximum of ten years. The owner-transferor incurs the compensating tax in its entirety, notwithstanding ownership of the land for a portion or all of the years (up to ten) during which the land enjoyed a reduced valuation.

## III. THE COMPENSATING TAX IS NOT A PERMISSIBLE "TAXATION OF ... LAND" UNDER *COUNTY OF YAKIMA*

The question, then, is whether the tax qualifies as a "taxation of ... land" within

the *County of Yakima* framework. Although the question is simple, the answer is not so straight-forward. Indeed, the very ambiguity of this tax scheme leads us to conclude that it does not fall within an "unmistakably clear" congressional authorization.

At first blush it may appear that Grays Harbor calculates its compensating tax using traditional ad valorem property tax factors: the value of the land as the basis for the tax. According to the Supreme Court, however, this basis of valuation tells us nothing about the true nature of the tax. In fact, if anything, it favors the Nation: "The short of the matter is that the General Allotment Act explicitly authorizes only 'taxation of ... land,' not ... 'taxation based on the value of land.'" *County of Yakima*, 502 U.S. at 269, 112 S.Ct. 683. Hence, the Court in *County of Yakima* struck down a tax based upon the land's sale price. *See id.* at 268–70, 112 S.Ct. 683.

■ We see no meaningful distinction between the tax there and the one imposed here. The sale price of land is typically nothing more than a manifestation of its market value. *See* Black's Law Dictionary 971 (6th ed.1990) (defining "market value" as "[t]he price property would command in the open market"). There must be something more definitive about the character of a state taxation scheme before we can find that it unambiguously falls within the "narrow sense" of permissible taxation provided by the General Allotment Act. *County of Yakima*, 502 U.S. at 269, 112 S.Ct. 683.

The essence of this tax is that it is triggered by a specific event—a property transfer. Thus, it resembles the excise tax rejected by the Supreme Court in *County of Yakima* as much as, if not more than, the ad valorem tax that the Court condoned. In particular, we can discern quite a bit about this tax by acknowledging that it only arises as a result of a sale or transfer of land, and, in particular, a transfer to a specific type of owner, i.e., a tax-exempt entity.

Only by exercising its privilege to transfer this land to an owner of its choice does the Quinault Nation incur any tax. The fact that the tax is triggered by the property owner's decision represents the quintessential example of an excise tax: "a tax imposed on the performance of an act ... or the enjoyment of a privilege." *Black's Law Dictionary* 563 (6th ed.1990); *see Black v. State*, 67 Wash.2d 97, 406 P.2d 761, 762 (1965) ("the obligation to pay an excise tax is based upon the voluntary action of the person taxed in performing the act") (citation omitted).

■ The fact that this tax is contingent upon a transfer of property is even more indicative of a classic excise case. On this point Washington law is instructive: a tax is characterized as an excise tax when "[t]he event causing[the] tax to be levied is the transfer of ownership ...." *See High Tide Seafoods v. State*, 106 Wash.2d 695, 725 P.2d 411, 414 (1986) (emphasis in original). And perhaps even more emblematic of its true character is the fact that this tax only targets transfers to specific tax-exempt entities, thus making it even more calibrated to the owner's actions than the excise tax struck down in *County of Yakima*, a tax that applied generally to all transfers.

In sum, we can hardly dismiss the reason this tax arises as the tail that wags the dog. Just as a state might impose an excise tax on the purchase of cigarettes to discourage the use of tobacco, the State here has imposed such a tax on the transfer of forest land to an owner from whom it can no longer obtain future tax revenues. The particular nature of the event that

triggers this tax only serves to highlight how intertwined the owner's activity is with the character of the tax itself. The State is obviously concerned enough about the loss of future revenue to declassify land designated for forest use, thus triggering this tax, even when the land continues to be used for forest purposes. It is not difficult to conclude that such a tax has nothing to do with the land and everything to do with the type of owner to whom the land is transferred, thus bringing it well within the realm of excise taxes that the Supreme Court has already held to be impermissible.

We next address the argument that the method of calculation and collection somehow transforms the tax into a permissible one. An excise tax "remains a tax upon the Indian's activity of selling the land, and thus is void, *whatever means* may be devised for its collection." *County of Yakima*, 502 U.S. at 269, 112 S.Ct. 683 (emphasis added). Nonetheless, Grays Harbor would have us overlook the impetus for this tax and instead focus on the means of calculation in order to characterize it as a permissible ad valorem tax. But even looking at the tax from that perspective, we cannot conclude, however plausible the County's characterization may be, that this tax unambiguously falls within the scope of a permissible "taxation . . . of land." *See id.* at 268, 112 S.Ct. 683 (constructions of permissible tax schemes must not only be plausible but unambiguous).

■ Liability for a permissible ad valorem tax "flows *exclusively* from ownership of realty on the annual date of assessment." *Id.* at 266, 112 S.Ct. 683 (emphasis added). *See also City of Walla Walla v. State*, 197 Wash. 357, 85 P.2d 676, 678 (1938) ("The general ad valorem tax upon real property . . . is imposed directly upon the property and exacted from all owners thereof. It is levied annually, at a regular

time, and operates uniformly according to fixed general rules."). At least two problems arise when we attempt to squeeze this tax into that definition. The first and most obvious is discussed above: liability flows as much from the owner's decision to transfer the land as it does from the fact that the owner possesses the land.

Equally problematic, though, is the way in which this tax is calculated. The County's position ultimately relies upon the notion that this scheme essentially collects real property taxes after the fact. Under this rationale, it presumably does not matter what triggers the tax because it simply represents recoupment of a permissible tax on the land. The difficulty with this characterization is that it is simply a fiction. As noted above, the compensating tax is not necessarily identical to the land owner's tax savings because the tax is not calculated by merely summing up the tax savings from the previous years. Nor is the tax calculation necessarily related solely to the ownership of the current property holder, as it goes back ten years and can span a number of different owners.

The actual tax that is levied under this scheme utilizes the property's "new assessed valu[e]" as the yardstick for assessing the amount due rather than the land's actual value in the preceding years that it was classified for forest use. Wash. Rev. Code § 84.33.120(7). In many, if not most cases in which land loses its forest use classification, utilization of this formula will result in something more than simple recoupment of any ad valorem tax that could have been assessed in earlier years. For instance, the State argues that the tax kicks in if the Nation were to put a resort on the property, *see id.* § 84.33.120(5)(c), or if the County's assessor were to determine that the property had a higher and better use, *see id.* § 84.33.120(5)(d). *See* Answering Brief at 14. We can thus sur-

mise that the new assessed value would exceed the prior value of the land, resulting in a larger tax than could have been assessed under traditional ad valorem principles.

Perhaps we could explain any resulting disparities by positing that the compensation formula simply derives from the need for administrative ease in approximating the lost revenue. However, the County's utilization of this formula and the obvious potential for disparities only reinforce our view that its method of calculating the tax may be more a matter of convenience for meeting the State's policy objectives of maintaining forest use and a steady stream of future revenues—objectives that are inextricably tied to the tax's triggering events—than an attempt to recover taxes it could have, but did not, impose in the past. The reality is that the calculation itself is not related exclusively to the Quinault Nation's ownership on the date of assessment but to a number of other factors and considerations.

Stepping back, this taxation scheme can be seen as something of a hybrid that defies any easy or definitive characterization, but in the end we cannot ignore the classic excise tax attributes upon which it is so dependent. Indeed, this tax may be a "taxation of [a] transaction[ ] involving land" or it may be a "taxation with respect to land," but the tax cannot be perceived as a clear and unambiguous "taxation of . . . land." *County of Yakima*, 502 U.S. at 269, 112 S.Ct. 683. Accordingly, we conclude that the compensating tax does not fall within the limited scope of permissible taxation allowed under the General Allotment Act and *County of Yakima*.

**REVERSED.**