2002 ND 83

CASS COUNTY JOINT WATER RE-SOURCE DISTRICT, a political sub-division of the State of North Dakota, Plaintiff and Appellant,

v.

1.43 ACRES OF LAND IN HIGHLAND TOWNSHIP, Cass County, North Dakota, Turtle Mountain Band of Chippewa Indians, a/k/a Turtle Lake Band of Chippewa Indians, and Roger W. Shea, Defendants and Appellees.

No. 20010217.

Supreme Court of North Dakota.

May 14, 2002.

Steven E. McCullough (argued), Ohnstad Twichell, P.C., West Fargo, N.D., for plaintiff and appellant.

Jerilyn DeCoteau (argued), Boulder, CO, Sarah M. Vogel and Courtney M. Koebele (appeared), Wheeler Wolf, Bismarck, N.D., for defendant and appellee Turtle Mountain Band of Chippewa Indians.

Russell John Myhre (appeared), Enderlin, N.D., for defendant and appellee Roger W. Shea.

Jerald A. Hjelmstad, N.D. League of Cities, Bismarck, N.D., for amicus curiae North Dakota League of Cities.

Charles M. Carvell, Assistant Attorney General, Bismarck, N.D., for amicus curiae State of North Dakota.

Calvin N. Rolfson, Rolfson Schulz Lervick & Geiermann Law Offices, P.C., Bismarck, N.D., for amicus curiae North Dakota Association of Counties.

Gary Michael Beaudry, Three Affiliated Tribes, Williston, N.D., for amicus curiae Three Affiliated Tribes.

NEUMANN, Justice.

[¶ 1] The Cass County Joint Water Resource District ("the District") appeals from a judgment dismissing its action seeking to acquire by condemnation 1.43 acres of land in Highland Township. We reverse and remand, concluding that neither tribal sovereign immunity nor the Federal Nonintercourse Act, 25 U.S.C. § 177, prohibits an in rem condemnation action against the land, and that the trial court erred in dismissing Roger Shea as a defendant in the action.

I

[¶ 2] The District is a political subdivision of the State of North Dakota authorized to manage water resources within Cass County. In 1994, the District submitted an application to the United States

Army Corps of Engineers to build a dam on the Maple River in Cass County to provide flood control in eastern North Dakota. In conjunction with the project, the District has attempted to acquire the 1.43 acre tract of land at issue in this case. The land will be subject to frequent flooding if the dam is built.

[¶ 3] In a series of treaties between 1851 and 1873, the Mdewakanton, Wahpakoota, Sisseton, and Wahpeton bands of the Sioux Indians ceded territory, including the 1.43 acre tract, to the United States. In the late 1800s the land was transferred by patent to the Northern Pacific Railroad Company and was privately owned for more than one hundred years. At the time the District began the process of approval for the dam, the 1.43 acre tract was owned by Roger Shea as part of a larger parcel of land. Shea opposed construction of the dam. On July 28, 2000, Shea conveyed the 1.43 acre tract to the Turtle Mountain Band of Chippewa Indians ("the Tribe") by warranty deed for $500, reserving in himself the right to graze livestock on the land. On February 6, 2001, Shea executed a quit claim deed conveying his right to graze livestock on the 1.43 acre tract to the Tribe for $1. The July 28, 2000 warranty deed was recorded; the February 6, 2001 quit claim deed was not.

[¶ 4] The Tribe is a federally recognized Indian tribe and has a 43,000 acre reservation in Rolette County. The 1.43 acre tract at issue in this case is located approximately 200 miles from the reservation. The land does not lie within the aboriginal homelands of the Tribe, is not allotted land, and is not held in trust by, or otherwise under the superintendence of, the federal government. The Tribe contends, however, that its ancestors once occupied the area and that the 1.43 acre tract contains a culturally significant village site and burial site.

[¶ 5] In February 2001, the District brought this action seeking condemnation of the 1.43 acre tract, naming the Tribe and Shea as defendants. The Tribe moved to dismiss the action, arguing that it enjoyed sovereign immunity from suit and that condemnation of land owned by the Tribe would violate the Federal Nonintercourse Act. Shea also moved to dismiss the action against him, arguing he no longer had any interest in the 1.43 acre tract. The district court concluded that the action against the Tribe was barred by sovereign immunity and that Shea had no interest in the property. Judgment was entered dismissing the action, and the District appealed.

II

[¶ 6] The primary issue presented in this case is apparently one of first impression nationally: May a state condemn land within its territorial boundaries which has been purchased in fee by an Indian tribe, but which is not reservation land, aboriginal land, allotted land, or trust land? The district court held that, in order to entertain the condemnation action, it required both in rem jurisdiction over the land and in personam jurisdiction over the Tribe. The court concluded that tribal sovereign immunity barred assertion of in personam jurisdiction over the Tribe, and it therefore lacked jurisdiction to hear the condemnation action.

[¶ 7] On appeal, the District argues the court did not need in personam jurisdiction over the Tribe because condemnation is a purely in rem action, and sovereign immunity therefore does not bar the action. The Tribe argues that in personam jurisdiction is required and the court correctly concluded it lacked jurisdiction.

A

[¶ 8] It is well settled that a condemnation action is strictly in rem.

See, e.g., *McKenzie County v. Hodel,* 467 N.W.2d 701, 705 (N.D.1991); *United States v. Petty Motor Co.,* 327 U.S. 372, 376, 66 S.Ct. 596, 90 L.Ed. 729 (1946); *Farley v. State,* 180 Ga.App. 694, 350 S.E.2d 263, 264 (1986); *Utilities, Inc. v. Washington Suburban Sanitary Comm'n,* 362 Md. 37, 763 A.2d 129, 135 (2000); *State v. Clark,* 238 Or. 505, 395 P.2d 146, 148 (1964); *In re Petition of Seattle,* 56 Wash.2d 541, 353 P.2d 955, 957 (1960); 6 Julius L. Sackman, *Nichols on Eminent Domain* § 26A.05[1] (2001). A proceeding in rem is an action against the property itself, and in personam jurisdiction is not required. *See, e.g., Catlin v. Catlin,* 494 N.W.2d 581, 588 (N.D.1992); *Smith v. Smith,* 459 N.W.2d 785, 787–88 (N.D.1990); *Freeman v. Alderson,* 119 U.S. 185, 187, 7 S.Ct. 165, 30 L.Ed. 372 (1886); *Phillips v. Chas. Schreiner Bank,* 894 F.2d 127, 132 (5th Cir.1990); *Farley,* 350 S.E.2d at 264; *In re Petition of Seattle,* 353 P.2d at 957–58; Restatement (Second) of Conflict of Laws § 59 (1988).

[¶ 9]    The general rule is set out in 20 Am.Jur.2d *Courts* § 80 (1995): "[A] decision in rem does not impose responsibility or liability on a person directly, but operates directly against the property in question ... irrespective of whether the owner is subject to the jurisdiction of the court in personam." *See also* 59 Am. Jur.2d *Parties* § 1 (1987) ("in an in rem proceeding there are no parties in the sense of opposing litigants," and "a defendant to proceed against is essential in all civil proceedings except where the action is strictly in rem"). The essential nature of an in rem proceeding is delineated in 1 Am.Jur.2d *Actions* § 34 (1994) (footnotes omitted):

A proceeding in rem is essentially a proceeding to determine rights in a specific thing or in specific property, against all the world, equally binding on everyone. It is a proceeding that takes no cognizance of an owner or person with a beneficial interest, but is against the thing or property itself directly, and has for its object the disposition of the property, without reference to the title of individual claimants. The action of the court is binding, even in the absence of any personal notice to the party interested or any jurisdiction over his person.

[¶ 10]    The Supreme Court of the United States outlined the distinctions between in rem and in personam jurisdiction in *Shaffer v. Heitner,* 433 U.S. 186, 199, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (emphasis added):

[S]tate authority to adjudicate was based on the jurisdiction's power over either persons or property. This fundamental concept is embodied in the very vocabulary which we use to describe judgments. If a court's jurisdiction is based on its authority over the defendant's person, the action and judgment are denominated *"in personam"* and can impose a personal obligation on the defendant in favor of the plaintiff. If jurisdiction is based on the court's power over property within its territory, the action is called *"in rem"* or *"quasi in rem."* The effect of a judgment in such a case is limited to the property that supports jurisdiction and does not impose a personal liability on the property owner, *since he is not before the court.*

The Court in *Shaffer* thus recognized that in rem jurisdiction can be exercised without acquiring in personam jurisdiction over a party, but concluded that due process requires that there be minimum contacts between the party and the forum state. *Id.* at 212, 97 S.Ct. 2569, 53 L.Ed.2d 683; *see also Smith,* 459 N.W.2d at 787–88. There is no due process problem in this case. As the Court noted in *Shaffer,* 433 U.S. at 207–08, 97 S.Ct. 2569, 53 L.Ed.2d 683 (footnotes omitted):

[T]he presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction. In such cases, the defendant's claim to property located in the State would normally indicate that he expected to benefit from the State's protection of his interest. The State's strong interests in assuring the marketability of property within its borders and in providing a procedure for peaceful resolution of disputes about the possession of that property would also support jurisdiction, as would the likelihood that important records and witnesses will be found in the State.

The Tribe, through its ownership of the subject property and other activities within the State, has sufficient contacts with the State to satisfy due process.

■ [¶ 11] In the specific context of a condemnation action, the Supreme Court of Washington has noted that, because the action is in rem, in personam jurisdiction is not necessary and the purpose of service of the summons and complaint upon the landowner is only to provide notice and an opportunity to be heard:

[A]n action to condemn private property for a public use is a proceeding *in rem,* and not *in personam.* Thus, personal jurisdiction over the landowner, or landowners, is not a prerequisite to valid court action. The service of a copy of the petition and summons, provided for by RCW 8.12.070, is solely for the purpose of imparting notice to the landowner, or landowners, of the pendency of the proceedings against the land.

*In re Petition of Seattle,* 353 P.2d at 957–58 (citations omitted). Similarly, the court

in *United States v. Winn,* 83 F.Supp. 172, 174–75 (W.D.S.C.1949) (citations omitted), concluded:

A condemnation proceeding is a proceeding in rem. The only need for having any person a party to a condemnation proceeding is to give him notice and enable him to have a hearing on the disposition of the res before the court. . . .

Condemnation proceedings result in "a taking, not of the rights of designated persons in the thing needed, but of the thing itself, with a general monition to all persons having claims in the thing." *United States v. Dunnington,* 146 U.S. 338, 352, 13 S.Ct. 79, 83, 36 L.Ed. 996. Persons are made parties to condemnation suits, not to confer jurisdiction upon the court to render a personal judgment, but to enable the condemnor to acquire the property free from all claims, legitimate or spurious.

*See also Farley,* 350 S.E.2d at 264 (in a condemnation proceeding "it is jurisdiction over the property rather than its owner that is essential," and "[t]he statute requires only that a copy of the action 'be served on the owner . . . , if known' "). Thus, to comport with due process, property owners of record must be given notice and an opportunity to be heard in the condemnation action. *See* N.D.C.C. § 32–15–18(2) (condemnation complaint must include "[t]he names of all owners and claimants of the property, if known, . . . who must be styled defendants"); N.D.C.C. § 32–15–20 (all persons claiming an interest in the property may appear and defend in the condemnation action); N.D.R.Civ.P. 4(e)(1)(F) (authorizing service by publication in condemnation actions).

### B

[¶ 12] In support of its contention that tribal sovereign immunity bars this condemnation action, the Tribe relies heavily

upon cases which stress the continued validity of tribal sovereign immunity. *See, e.g., Kiowa Tribe of Oklahoma v. Manufacturing Techs., Inc.,* 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). We do not question the continued validity of the doctrine of tribal sovereign immunity. Rather, the novel question presented in this case is whether tribal sovereign immunity bars a purely in rem action against land held by the Tribe in fee and which is not reservation land, allotted land, aboriginal land, or trust land. The Tribe has not cited any case holding that tribal sovereign immunity bars an in rem condemnation action in state court.

[¶ 13] Courts have recognized distinctions in application of the doctrine of tribal sovereign immunity based upon the in rem or in personam nature of the proceedings. For example, the Supreme Court of the United States has indicated states may exercise broader jurisdiction over tribal lands in an in rem proceeding than in an in personam proceeding. In *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), the county imposed an ad valorem tax on real property and an excise tax on sales of the property. The county had for many years imposed these taxes on allotted lands which had been patented and which were held in fee by tribal members or the tribe itself. When the county sought to foreclose on such properties for non-payment of the taxes, the tribe challenged the state's authority to impose the taxes on land held by the tribe or its members.

[¶ 14] The Court's resolution of this issue turned in part upon interpretation of federal statutes governing allotment of Indian land to individual tribal members. Under the Indian General Allotment Act of 1887, 24 Stat. 388, the President had the authority to allot land to tribal members, and the land would be held in trust by the United States for a period of twenty-five years or longer, when a fee patent would be granted. *County of Yakima,* 502 U.S. at 254, 112 S.Ct. 683, 116 L.Ed.2d 687. The Burke Act of 1906, 34 Stat. 182, clarified that state civil and criminal jurisdiction over allotted lands would only lie at the expiration of the trust period when the land had been conveyed by fee patent. *County of Yakima,* at 255, 112 S.Ct. 683, 116 L.Ed.2d 687. A proviso to the Burke Act authorized the President to issue a fee patent prior to expiration of the specified trust period, and provided that upon such premature patenting all restrictions as to sale, encumbrance, or taxation of the land would be removed. *Id.*

[¶ 15] Although the Court's resolution of the taxation issue involved interpretation of the statutory provisions, the Court addressed distinctions in the state's authority over tribal land based upon the in rem or in personam nature of the proceedings. The Court noted that the county's assertion of jurisdiction over fee-patented lands located on the reservation was permissible if it was in rem rather than in personam. *County of Yakima,* 502 U.S. at 264–65, 112 S.Ct. 683, 116 L.Ed.2d 687. The Court concluded that the ad valorem property tax was an in rem tax upon the property itself, and therefore permissible, but the excise tax was transactional, implicating in personam jurisdiction, and was impermissible:

> Turning away from the statutory texts altogether, the Yakima Nation argues that state jurisdiction over reservation fee land is manifestly inconsistent with the policies of Indian self-determination and self-governance that lay behind the Indian Reorganization Act and subsequent congressional enactments. This seems to us a great exaggeration. While the *in personam* jurisdiction over reservation Indians at issue in *Moe [v. Confederated Salish and Kootenai*

*Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) ] would have been significantly disruptive of tribal self-government, the mere power to assess and collect a tax on certain real estate is not. . . .

. . . .

Liability for the ad valorem tax flows exclusively from ownership of realty on the annual date of assessment. The tax, moreover, creates a burden on the property alone. . . .

. . . .

We think the excise tax on sales of fee land is another matter, as did the Court of Appeals. While the Burke Act proviso does not purport to describe the entire range of *in rem* jurisdiction States may exercise with respect to fee-patented reservation land, we think it does describe the entire range of *jurisdiction to tax.*

*County of Yakima,* 502 U.S. at 265–66, 268, 112 S.Ct. 683, 116 L.Ed.2d 687 (citation omitted).

[¶ 16]   In *Anderson & Middleton Lumber Co. v. Quinault Indian Nation,* 130 Wash.2d 862, 929 P.2d 379 (1996), a lumber company brought an action in state court to partition and quiet title to property located on an Indian reservation. The lumber company owned an undivided five-sixths interest in the surface estate and an undivided one-half interest in the mineral estate. The remaining interests were owned by ten individuals as tenants in common with the lumber company. All of the land was formerly tribal land which had been fee patented, removing all restrictions on alienation, in 1958.

[¶ 17]   After the action was commenced, the ten individual owners deeded their interests to the Quinault Indian Nation, which then challenged the court's jurisdiction on the basis of tribal sovereign immunity. Noting the United States Supreme Court's conclusion in *County of Yakima*

that the federal statutory provision on sale, encumbrance, and taxation of fee patented reservation land "does not purport to describe the entire range of a state's *in rem* jurisdiction over such land," *Quinault,* 929 P.2d at 385, the Supreme Court of Washington concluded the trial court could properly exercise in rem jurisdiction over the property:

It is not disputed that the trial court had proper jurisdiction over this action when it was filed. The subsequent sale of an interest in the property to an entity enjoying sovereign immunity (Quinault Nation) is of no consequence in this case because the trial court's assertion of jurisdiction is not over the entity *in personam,* but over the property or the "res" *in rem.* Because the res or property is alienable and encumberable under a federally issued fee patent, it should be subject to a state court *in rem* action which does nothing more than divide it among its legal owners according to their relative interests. Reacquisition of a portion of the land by a federally recognized Indian tribe does not alter this result because tribal reacquisition of fee land does not affect the land's alienable status. This conclusion is consistent with *County of Yakima.*

*Quinault,* at 385 (footnote omitted).

[¶ 18]   The court rejected the Quinault Nation's contention that in personam jurisdiction was required, and that the action was therefore barred by tribal sovereign immunity:

The Nation also contends that, regardless whether the trial court had *in rem* jurisdiction over the property, the real issue in this case is whether the Nation waived its sovereign immunity. This argument ultimately leads to the proposition that *in rem* jurisdiction alone is not sufficient to extend the State's authority to partition suits in-

volving reservation fee patented land. Under that theory, this court would have to determine that the trial court acquired *in personam* jurisdiction over the Nation, as well as *in rem* jurisdiction over the property, to uphold its assertion of jurisdiction in this case. But the decision in *County of Yakima*, which based state jurisdiction to tax and foreclose on reservation fee land exclusively *in rem*, contradicts that contention.

. . . .

Because our decision is based upon *in rem* jurisdiction, we need not further consider *in personam* jurisdiction, immunity and waiver.

*Quinault*, 929 P.2d at 386–87 (footnote omitted).

[¶ 19] Although the parties have not cited, and we have not found, any reported decision addressing tribal sovereign immunity in the context of a condemnation action, the Supreme Court of the United States has addressed the analogous question of whether a state's sovereign immunity bars a condemnation action in the courts of another state. In *State of Georgia v. City of Chattanooga*, 264 U.S. 472, 44 S.Ct. 369, 68 L.Ed. 796 (1924), the State of Georgia had purchased land in Chattanooga, Tennessee, for use as a railroad yard. The City sought to condemn part of the land as a right of way for a street. Georgia argued it was not subject to the jurisdiction of the courts of Tennessee because it enjoyed sovereign immunity. The Supreme Court concluded Georgia's claim of sovereign immunity did not deprive the Tennessee court of authority to condemn the property:

The power of Tennessee, or of Chattanooga as its grantee, to take land for a street, is not impaired by the fact that a sister state owns the land for railroad purposes. Having acquired land in another state for the purpose of using it in a private capacity, Georgia can claim no sovereign immunity or privilege in respect of its expropriation. . . . Land acquired by one state in another state is held subject to the laws of the latter and to all the incidents of private ownership. The proprietary right of the owning state does not restrict or modify the power of eminent domain of the state wherein the land is situated. . . . The sovereignty of Georgia was not extended into Tennessee. Its enterprise in Tennessee is a private undertaking. It occupies the same position there as does a private corporation authorized to own and operate a railroad, and, as to that property, it cannot claim sovereign privilege or immunity. Undoubtedly Tennessee has power to open roads and streets across the railroad land owned by Georgia.

. . . .

Having divested itself of its sovereign character, and having taken on the character of those engaged in the railroad business in Tennessee, its property there is as liable to condemnation as that of others, and it has, and is limited to, the same remedies as are other owners of like property in Tennessee. *The power of the city to condemn does not depend upon the consent or suability of the owner.*

*State of Georgia*, 264 U.S. at 479–82, 44 S.Ct. 369, 68 L.Ed. 796 (citations omitted; emphasis added); *see also Paulus v. State of South Dakota*, 58 N.D. 643, 650, 227 N.W. 52, 55 (1929) and *Paulus v. State of South Dakota*, 52 N.D. 84, 93, 201 N.W. 867, 870 (1924) (in tort action against State of South Dakota for injuries sustained in a coal mine located in North Dakota but owned by South Dakota, the Court suggests sovereign immunity would not bar an in rem action against property owned by another state within this state); *People v. Streeper*, 12 Ill.2d 204, 145 N.E.2d 625, 629

(1957) (when one state has acquired land in another state, the land is held subject to the laws of the latter state and to all incidents of private ownership, and sovereign immunity does not bar an action concerning the property in state court).

### C

[¶ 20]   In light of the foregoing authorities, we conclude the district court could validly exercise jurisdiction over this condemnation action.  The State, and the District acting on behalf of the State, has broad authority to acquire property located within its territorial jurisdiction to be used for public purposes.  A condemnation action is purely in rem, and does not require acquisition of in personam jurisdiction over the owners of the land.  In the words of the United States Supreme Court, the power to condemn "does not depend upon the consent or suability of the owner." *State of Georgia*, 264 U.S. at 482, 44 S.Ct. 369, 68 L.Ed. 796.

[¶ 21]   The land at issue in this case is essentially private land which has been purchased in fee by an Indian tribe.  It is not located on a reservation, is not allotted land, is not part of the Tribe's aboriginal land, is not trust land, and the federal government exercises no superintendence over the land.   Under these circumstances, the State may exercise territorial jurisdiction over the land, including an in rem condemnation action, and the Tribe's sovereign immunity is not implicated.

[¶ 22]   In reaching this conclusion, we are mindful that this case presents competing claims of sovereignty.  The Tribe contends that it enjoys sovereign immunity from suit in a state court.  The District, exercising the State's power of eminent domain, argues it has the inherent right to take property located within its territorial boundaries when necessary for the public good.

[¶ 23]   The State's power of eminent domain is one of the hallmarks of sovereignty.   Eminent domain is an inherent attribute of sovereignty which does not require or depend upon a constitutional grant or recognition. *Johnson v. Wells County Water Res. Bd.*, 410 N.W.2d 525, 527 (N.D.1987); *Square Butte Elec. Coop. v. Hilken*, 244 N.W.2d 519, 522 (N.D.1976). The Supreme Court of the United States has delineated the broad authority a state possesses to condemn property within its territorial boundaries:

> The power of eminent domain is an attribute of sovereignty, and inheres in every independent state.  The taking of private property for public use upon just compensation is so often necessary for the proper performance of governmental functions that the power is deemed to be essential to the life of the state.   It cannot be surrendered, and, if attempted to be contracted away, it may be resumed at will.   It is superior to property rights, and extends to all property within the jurisdiction of the state. . . .

*State of Georgia*, 264 U.S. at 480, 44 S.Ct. 369, 68 L.Ed. 796 (citations omitted).

[¶ 24]   The decision of the district court, if affirmed, would have far-reaching effects on the eminent domain authority of states and all other political subdivisions.  Indian tribes would effectively acquire veto power over any public works project attempted by any state or local government merely by purchasing a small tract of land within the project.  The district court recognized the wide-ranging effects upon the State's authority to condemn property:

> Truly, the facts of this case present a conundrum.  The record shows that the Tribe purchased the 1.43 acres from a non-Indian.  The parcel in question has never been part of reservation land set aside for exclusive and absolute use by the Tribe and is located hundreds of

miles outside the current exterior boundaries of the reservation. If tribal immunity bars the condemnation proceeding, the common sense result is that a non-Indian could convey real property to an Indian Tribe, not even located in the State of North Dakota, for purposes of stalling any street, water, sewage, road, or other public improvement project. Such a result infringes upon the sovereign immunity of the State of North Dakota to provide for the public safety, health and welfare of its people who benefit—including Indians—from such public improvements. The State's projects will either be permanently stalled or the State will be forced to pay exorbitantly high prices to purchase the land through private sale.

[¶ 25] While the Tribe alleges that Indian tribes would not routinely attempt to block valid public projects, and although we do not question the sincerity of the Tribe's motives in purchasing the 1.43 acres, we must consider this case in its current procedural posture and the potential ramifications of our resolution of this issue. The Tribe's assertion of sovereign immunity is not based upon its alleged motives for acquiring the land or its future use of the land; it argues sovereign immunity applies solely because title is held by an Indian tribe. If the State is automatically stripped of its authority to acquire property for public use whenever a tribe purchases a small tract of land within the project, all public works projects will be subject to uncertainty.

### III

[¶ 26] The Tribe argues that, even if the condemnation action is not barred by tribal sovereign immunity, condemnation of the property would violate the Federal Nonintercourse Act, 25 U.S.C. § 177.[1]

The Nonintercourse Act provides, in pertinent part:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177. At the time of its enactment in 1834, the Act was intended to protect Indian tribes by ensuring Indian lands were settled peacefully and Indians were treated fairly, and to protect them from the "greed of other races" and "artful scoundrels inclined to make a sharp bargain." *Lummi Indian Tribe v. Whatcom County*, 5 F.3d 1355, 1358 (9th Cir.1993) (quoting *United States v. Candelaria*, 271 U.S. 432, 442, 46 S.Ct. 561, 70 L.Ed. 1023 (1926) and *Tuscarora Nation of Indians v. Power Authority*, 257 F.2d 885, 888 (2d Cir.1958), *vacated as moot by McMorran v. Tuscarora Nation of Indians*, 362 U.S. 608, 80 S.Ct. 960, 4 L.Ed.2d 1009 (1960)). Congress did not distinguish between Indian trust lands and Indian fee lands when enacting the statute, "presumably because it did not contemplate that Indian tribes could hold land in fee simple." *Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 549 (1st Cir.1997).

[¶ 27] When Congress removes restraints on alienation on Indian land which was originally held in trust, state laws are fully applicable to subsequent claims. *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 508, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). As the Court further noted in *Catawba*, at 508 n.

---

1. Although the district court found it unnecessary to address this issue, an appellee may attempt to save a favorable judgment by urg-

ing any ground asserted in the trial court. *E.g., Tangen v. North Dakota Workers Comp. Bur.*, 2000 ND 135, ¶ 8 n. 1, 613 N.W.2d 490.

19, 106 S.Ct. 2039, 90 L.Ed.2d 490 (quoting *Larkin v. Paugh,* 276 U.S. 431, 439, 48 S.Ct. 366, 72 L.Ed. 640 (1928)):

"With the issue of the patent, the title not only passed from the United States but the prior trust and the incidental restrictions against alienation were terminated. This put an end to the authority theretofore possessed by the Secretary of the Interior by reason of the trust and restriction—so that thereafter all questions pertaining to the title were subject to examination and determination by the courts, appropriately those in Nebraska, the land being there."

The question presented in this case is whether the restraints of the Nonintercourse Act automatically attach when an Indian tribe purchases from a private landowner property which had previously been patented in fee by the federal government and which had been freely alienable.

[¶ 28] In *Cass County v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 115 n. 5, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998), the Supreme Court of the United States noted:

"This Court has never determined whether the Indian Nonintercourse Act, which was enacted in 1834, applies to land that has been rendered alienable by Congress and later reacquired by an Indian tribe."

Although the Court found it unnecessary to address the issue in that case, other courts have concluded the protections of the Nonintercourse Act do not apply to land which has been rendered freely alienable by Congress, held by private parties, and subsequently acquired by an Indian tribe.

[¶ 29] For example, in *Lummi Indian Tribe v. Whatcom County,* 5 F.3d 1355 (9th Cir.1993), the court addressed whether land which was part of the tribe's reservation, but which had been patented to

individuals under a treaty and subsequently reacquired by the tribe, was subject to the protections of the Nonintercourse Act. The United States Court of Appeals for the Ninth Circuit held:

No court has held that Indian land approved for alienation by the federal government and then reacquired by a tribe again becomes inalienable. To the contrary, courts have said that once Congress removes restraints on alienation of land, the protections of the Nonintercourse Act no longer apply. . . .

We hold that the parcels of land approved for alienation by the federal government and then reacquired by the Tribe did not then become inalienable by operation of the Nonintercourse Act.

*Lummi,* at 1359.

[¶ 30] Similarly, in *Anderson & Middleton Lumber Co. v. Quinault Indian Nation,* 130 Wash.2d 862, 929 P.2d 379 (1996), the Supreme Court of Washington considered whether the Nonintercourse Act prohibited an action to partition and quiet title to property on a reservation which had been fee patented to individual owners and subsequently reacquired by the nation. The court concluded:

The Nonintercourse Act is not applicable to this case. . . . [O]nce the United States removes restraints on alienation of Indian land, as it did here under a fee patent, the protections of the Nonintercourse Act no longer apply. Reacquisition of the land by the Nation does not change this result since "parcels of [Indian] land approved for alienation by the federal government and then reacquired by the Tribe [do] not then become inalienable by operation of the Nonintercourse Act."

*Quinault,* 929 P.2d at 387 (footnotes omitted) (quoting *Lummi,* 5 F.3d at 1359). The court further held:

Although the Indian Nonintercourse Act preempts operation of any state law affecting the ownership of Indian trust land, the protections of the Act do not apply to lands made alienable and encumberable under a federally issued fee patent. Subsequent reacquisition of the land by an Indian tribe does not change this result because the land's alienable status is not altered.

*Quinault,* at 388.

[¶ 31] The Court of Appeals of Michigan reached the same result in *Bay Mills Indian Cmty. v. State,* 244 Mich.App. 739, 626 N.W.2d 169 (2001), *cert. denied,* 122 S.Ct. 1303 (2002). In that case, land which had previously been held in trust for the tribe by the federal government was fee patented to a non-Indian, creating fee simple private ownership. *Id.* at 172. The land was subsequently deeded to the Governor of Michigan for the use and benefit of the tribe. When property taxes on the land became delinquent the county sued for nonpayment of taxes, and the land was sold at a tax sale to private individuals. The tribe subsequently sued for damages for loss of use of the land, claiming the transfer of Indian land by tax sale violated the Nonintercourse Act. The court disagreed:

> As previously discussed, once the United States removed the restraint on alienation of the land by patenting it in fee simple to [a private party], the property was subject to taxation. Nothing in the Indian trade and intercourse act suggests that its protections precluded taxation or that it acted to revive the federal government's interest in the property sufficiently to require its consent for transfer by tax sale. Furthermore, "courts have said that once Congress removes restraints on alienation of land, the protections of the Nonintercourse Act no longer apply." *Lummi, supra* at 1359. We therefore conclude that the Governor's acquisition of the

land in trust for plaintiff's predecessors did not trigger the protections of the act and that the state's transfer of the property at tax sale did not violate the act.

*Bay Mills,* at 174 (citation omitted); *see also Mashpee Tribe v. Watt,* 542 F.Supp. 797, 803 (D.Mass.1982), *aff'd,* 707 F.2d 23 (1st Cir.1983) (the Nonintercourse Act does not restrict "the alienation of property acquired by Indians from non-Indians in settled sections of the country"); Mary Jane Sheppard, *Taking Indian Land Into Trust,* 44 S.D.L.Rev. 681, 682–83 (1999) (suggesting that, although tribes may own land without putting it into trust with the federal government, "doing so better preserves the tribe's land base because interests in land held in trust may not be sold or otherwise alienated without an Act of Congress" under the Nonintercourse Act).

[¶ 32] We agree with the conclusion of these authorities that once the federal government removes restraints on alienation of land, the land does not become inalienable under the Nonintercourse Act merely because it is acquired by an Indian tribe. The result is even clearer in this case, where the Tribe's historical interest in the land is far more tenuous than in the above cases. In *Lummi, Quinault,* and *Bay Mills,* the land had previously been held in trust for the tribe. In this case, the land had never been held in trust by the federal government for the Turtle Mountain Band, nor apparently for any other tribe. Rather, the land was acquired by the federal government in a series of treaties in the 1800s from the Sioux Indians. It was subsequently fee patented and held in private ownership for more than one hundred years before the Tribe purchased it in fee from a private landowner in 2000. In *Lummi* and *Quinault,* each court concluded the land was not subject to the Nonintercourse Act even though it was located on the tribe's reservation. The land in this

case was never part of the Tribe's reservation.

[¶ 33] We conclude that the Nonintercourse Act does not apply to land which the Tribe has purchased in fee, which is located hundreds of miles from its reservation, which had never been held in trust for the Tribe, and which had been privately owned for more than one hundred years. This 1.43 acre tract is simply private land which has been purchased by the Tribe. We conclude that the Nonintercourse Act does not apply to conveyance of this land and does not preclude the condemnation action.

## IV

[¶ 34] The District contends the district court erred in dismissing Shea as a defendant in this action. The court concluded that Shea had conveyed his entire interest in the property to the Tribe and, because he no longer retained any interest in the land, dismissal was proper. The District contends that, because the February 6, 2001 quit claim deed was never recorded, Shea was a record owner at the time the condemnation action was commenced and he should remain named in the action to assure clear title if the land is condemned.

[¶ 35] Section 32–15–18(2), N.D.C.C., requires that the complaint in a condemnation action contain "[t]he names of all owners and claimants of the property, if known, . . . who must be styled defendants." Under that statute, all record title owners at the time of the commencement of the action should be named in the complaint as defendants. *See Basin Elec. Power Coop. v. Miller*, 310 N.W.2d 715, 717 (1981). At the hearing on the motion to dismiss in district court, Shea's counsel conceded that "the plaintiff may have a right to proceed to obtain clear title, and thereby keep Mr. Shae's [sic] name in this

law suit, for example under the *Basin Electric* case."

[¶ 36] Given the unique nature of a condemnation action, we believe it is preferable under these circumstances to retain Shea as a named party rather than dismiss him from the action. As we have previously indicated, a condemnation action is an in rem action against the property directly, and in personam jurisdiction over the owners of the property is not required. Property owners are named in the complaint and "styled defendants," N.D.C.C. § 32–15–18(2), but the effect of a judgment in such a case is limited to the property and cannot impose personal liability upon the property owner, "since he is not before the court." *Shaffer v. Heitner*, 433 U.S. 186, 199, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). The purpose of naming property owners is to provide notice and an opportunity to be heard, and to enable the condemnor to acquire the property free from all claims. *United States v. Winn*, 83 F.Supp. 172, 174–75 (W.D.S.C. 1949); *In re Petition of Seattle*, 56 Wash.2d 541, 353 P.2d 955, 958 (1960). In order to ensure that the condemnor receives clear title to the land, free from any future claims, we believe it is preferable that record title holders remain named in the condemnation action.

[¶ 37] We recognize that there may be little practical difference between retaining Shea in the action and dismissing him. Because he has received notice and an opportunity to be heard, and has disclaimed any interest in the property, any judgment would be binding upon him should he attempt in the future to assert an interest in the property. However, since this is a purely in rem proceeding, he cannot be subject to any personal liability. If he claims no interest in the property, he need not participate further in the action and the judgment will have no effect on his

interests. Under these circumstances, it is preferable and consistent with our statutory scheme to include record title holders in a condemnation action as defendants even if they disclaim any interest in the property. Including all record title holders in the final condemnation judgment provides further assurance that the condemnor will receive clear title to the property free from future disputes.

[¶ 38] We conclude the district court erred in dismissing Shea as a defendant in this action.

## V

[¶ 39] We have considered the remaining issues and arguments raised by the Tribe and Shea and find them to be either without merit or unnecessary to our decision.[2] We do not answer questions that are unnecessary to the determination of an appeal. *E.g., BTA Oil Producers v. MDU Resources Group, Inc.*, 642 N.W.2d 873, 2002 ND 55, ¶ 76.

[¶ 40] We reverse the judgment dismissing the condemnation action and remand for further proceedings in accordance with this opinion.

[¶ 41] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ., concur.

2. The Tribe contends the District is not authorized to condemn a cemetery and should not be allowed to condemn tribal burial grounds. Because there are factual disputes remaining on this issue, we find it unnecessary to address the issue on appeal from the judgment dismissing on the basis of tribal sovereign immunity.