VILLANTI, Judge.
 

 The Miccosukee Tribe of Indians of Florida petitions for a writ of certiorari to quash the trial court’s order that denied its motion for final summary judgment in an eminent domain proceeding based on the Tribe’s alleged sovereign immunity and/or the provisions of the Federal Noninter-course Act, 25 U.S.C. § 177. In response, the Department of Environmental Protection contends that the three parcels of land at issue, which the Tribe purchased on the open market, are not protected by either the Tribe’s sovereignty or the Noninter-course Act. Because the Tribe has not shown that the trial court’s ruling departs from the essential requirements of the law, we deny the petition.
 

 By way of background, the Tribe reached a settlement with the State of Florida in 1982 concerning what land in Florida constituted “aboriginal land” of the Tribe. As part of that settlement agreement, the Tribe relinquished all rights that it had in any land other than certain identified aboriginal lands and its reservation, which is located wholly in Dade County. In 1987, Congress approved the settlement agreement between the Tribe and the State.
 
 See
 
 25 U.S.C. § 1772c.
 

 In 1997, the Tribe purchased three parcels of land in Collier County on the open market. One parcel was purchased from an individual; the other two were purchased from IMC Agribusiness, Inc., a phosphate mining company. Title to the land was held in fee simple by the Tribe. The Tribe took no immediate action to have the federal government take title to the land in trust for the Tribe so as to protect it as tribal land.
 

 On June 12, 2003, the Tribe filed a “fee-to-trust” application with the Department of the Interior, seeking to have the federal government take title to the land in trust for the Tribe. However, on August 26, 2003, before the Department of the Interi- or could take any action on the application, the Department of Environmental Protection filed a “petition in eminent domain” seeking to take these three parcels of land as part of an Everglades restoration project. Upon learning of this action, the Department of the Interior deferred any consideration of the Tribe’s “fee-to-trust” application pending resolution of the eminent domain proceedings.
 

 On October 16, 2003, the Tribe filed a motion to dismiss the petition in eminent domain based on insufficient service of process and sovereign immunity. The trial court denied this motion, and the Tribe sought certiorari review of the denial of sovereign immunity in this court. This court denied certiorari without opinion.
 
 See Miccosukee Tribe of Fla. v. Dep’t of Envtl. Prot. ex rel. Bd. of Trustees of the Internal Improvement Trust Fund,
 
 892 So.2d 1030 (Fla. 2d DCA 2004) (table decision). Thereafter, on May 17, 2005, the trial court entered an Order of Taking that vested title to the land in the Department of Environmental Protection upon its pay
 
 *33
 
 ment into the registry of the court of its good faith estimate of value, i.e., $2,228,137.50. This amount was deposited on May 20, 2005, and title to the land was vested in the State shortly thereafter. Importantly, the Tribe did not seek review of this order.
 

 For reasons not apparent from the parties’ appendices, the case then sat idle until late 2010, when the Department of Environmental Protection noticed the case for jury trial on the issue of compensation. In response, on February 28, 2011, the Tribe filed a motion for summary judgment seeking to have the 2005 deeds to the land set aside and the land returned to its ownership. The Tribe argued that it was entitled to summary judgment in its .favor due to its sovereign immunity. Alternatively, the Tribe argued that the land should be returned to it because it was taken in violation of the provisions of the Nonintercourse Act. After a full hearing, the trial court denied the Tribe’s motion.
 

 In this petition, the Tribe contends that the denial of its motion for summary judgment constituted a departure from the essential requirements of the law. Because the issue is one of sovereignty, we have jurisdiction to review this ruling through certiorari.
 
 See, e.g., Seminole Tribe of Fla. v. McCor,
 
 903 So.2d 353, 357-58 (Fla. 2d DCA 2005). However, the Tribe is not entitled to issuance of the writ because neither sovereign immunity nor the Nonin-tercourse Act prohibit the Department’s in rem condemnation action against land acquired by the Tribe on the open market and held by the Tribe in fee simple.
 

 The issues of both sovereign immunity and the applicability of the Nonintercourse Act were squarely addressed and decided adversely to the position taken by the Tribe here by the North Dakota Supreme Court in
 
 Cass County Joint Water Resource District v. l.43 Acres of Land in Highland Township,
 
 643 N.W.2d 685 (N.D.2002)—a case that is quite similar to the present case. In that case, the facts showed that the Chippewa Indians had purchased a 1.43 — acre parcel on the open market after plans for taking the property for construction of a dam had been announced.
 
 Id.
 
 at 688. The Chippewas were a federally recognized tribe that had a 43,000-acre reservation in North Dakota.
 
 Id.
 
 The 1.43-acre parcel was located some 200 miles from the reservation, did not lie within the aboriginal homelands of the Chippewa, was not allotted land, and was not held in trust for the Chippewas by the federal government.
 
 Id.
 
 When the Water Resource District sought to condemn the land, the Chippewas filed a motion to dismiss, arguing that they were immune from suit due to sovereign immunity and that condemnation would violate the Nonintercourse Act.
 
 Id.
 
 The North Dakota Supreme Court disagreed with both points.
 

 On the issue of sovereign immunity, the court noted that a condemnation action is an action in rem rather than in personam.
 
 Id.
 
 at 688-89. Because a proceeding in rem is an action against the property itself, the court is not required to acquire in personam jurisdiction over the landowner as a prerequisite to a valid court action.
 
 Id.
 
 at 690. Instead, “the purpose of service of the summons and complaint upon the landowner is only to provide notice and an opportunity to be heard.”
 
 Id.
 
 Thus, the Chippewas’ tribal sovereign immunity, while perhaps a bar to an action against the tribe itself, did not necessarily bar an action against the tribe’s land since personal jurisdiction was not required.
 

 In addressing the extent of in rem jurisdiction, the
 
 Cass County
 
 court relied on the discussion of the differences between in rem and in personam jurisdiction in
 
 *34
 

 County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,
 
 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992). In that case, the Supreme Court noted that the county had the authority to assert jurisdiction over and assess property taxes on land owned by the Yakima tribe.
 
 Id.
 
 at 263-64, 112 S.Ct. 683. This was true because the ad valorem tax created “a burden on the property alone,” rather than on the owner.
 
 Id.
 
 at 266, 112 S.Ct. 683. Such in rem assessments were proper against lands owned by the Yakimas in fee.
 
 Id.
 
 at 266-68, 112 S.Ct. 683. However, the Court distinguished such in rem assessments against land from a “transactional tax” on the sale of land, which is assessed against the seller rather than the land itself.
 
 Id.
 
 at 268, 112 S.Ct. 683. Because such taxes were imposed against the seller rather than the land, actions to collect those taxes would require in personam jurisdiction, which would, in turn, implicate the Yakimas’ sovereign immunity.
 
 Id.
 
 at 267-68, 270, 112 S.Ct. 683. Thus, such a “transactional tax” would be impermissible.
 

 Based on the
 
 Yakima
 
 Court’s explanation of the differences between in rem jurisdiction and in personam jurisdiction as they relate to Indian land, the
 
 Cass County
 
 court held that the state court had jurisdiction over an
 
 in rem
 
 action seeking the condemnation of land owned by the Chippewas in fee simple and that the tribe’s sovereign immunity was not implicated. In doing so, the court stated:
 

 The State, and the District acting on behalf of the State, has broad authority to acquire property located within its territorial jurisdiction to be used for public purposes. A condemnation action is purely in rem, and does not require acquisition of in personam jurisdiction over the owners of the land. In the words of the United States Supreme Court, the power to condemn “does not depend upon the consent or suability of the owner.”
 
 State of Georgia [v. City of Chattanooga],
 
 264 U.S. [472] at 482, 44 S.Ct. 369, 68 L.Ed. 796 [1924].
 

 The land at issue in this case is essentially private land which has been purchased in fee by an Indian tribe. It is not located on a reservation, is not allotted land, is not part of the Tribe’s aboriginal land, is not trust land, and the federal government exercises no superintendence over the land. Under these circumstances, the State may exercise territorial jurisdiction over the land, including an in rem condemnation action, and the Tribe’s sovereign immunity is not implicated.
 

 Cass
 
 Cnty.,
 
 643 N.W.2d at 694.
 

 The
 
 Cass County
 
 court’s reasoning is equally applicable to the Tribe’s argument in this case. The eminent domain action here is not an action against the Tribe itself, but instead is an action against land held in fee by the Tribe. The Department of Environmental Protection does not need personal jurisdiction over the Tribe — it needs only in rem jurisdiction over the land. And the land in question is not tribal reservation land, is not within the aboriginal homelands of the Tribe, is not allotted land, and is not held in trust by the federal government for the Tribe. Therefore, on these facts, the Tribe’s sovereign immunity is not implicated and does not bar this eminent domain action.
 

 Alternatively, the Tribe argues that the Nonintercourse Act bars this action. The Nonintercourse Act provides, in pertinent part:
 

 No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by
 
 *35
 
 treaty or convention entered into pursuant to the Constitution.
 

 25 U.S.C. § 177. When it was originally enacted in 1834, the Nonintercourse Act was intended to protect Indian tribes by ensuring that Indian lands were settled peacefully and that Indians were treated fairly.
 
 See, e.g., United States v. Candelaria,
 
 271 U.S. 432, 441-42, 46 S.Ct. 561, 70 L.Ed. 1023 (1926). The Act did not distinguish between Indian trust lands and Indian fee lands, “presumably because [Congress] did not contemplate that Indian tribes could hold land in fee simple.”
 
 Penobscot Indian Nation v. Key Bank of Maine,
 
 112 F.3d 538, 549 (1st Cir.1997).
 

 Subsequent legislation, however, did allow tribes to hold land in fee simple. In the late 19th century, Congress began “allotting” lands to individuals on a tribe-by-tribe basis, and the allotted land could be sold immediately.
 
 Cnty. of Yakima,
 
 502 U.S. at 253-54, 112 S.Ct. 683. Because the immediate sale of allotted land compromised Congress’s intent of encouraging tribes to become self-sufficient, Congress enacted the Indian General Allotment Act in 1887.
 
 Id.
 
 at 254, 112 S.Ct. 683. Under that Act, the allotted land was held by the United States in trust for a period of at least twenty-five years, after which the United States would issue a “fee-patent” that removed the restraints on alienation.
 
 Id.
 
 Subsequently, in 1934, Congress passed the Indian Reorganization Act, which “halted further allotments[,] ... extended indefinitely the existing periods of trust applicable to already allotted (but not yet fee-patented)” land, and restored unal-lotted surplus Indian lands to tribal ownership.
 
 Id.
 
 at 255. However, this Act did not reimpose any restraints on alienation of land that was already fee-patented, and it did not prevent tribes from purchasing land in fee simple on the open market.
 
 Id.
 
 at 255-56, 112 S.Ct. 683.
 

 As part of the Indian General Allotment Act in 1887, Congress provided that once any restraints on alienation on Indian land were removed, state civil and criminal law would apply and the owner would be subject to state law jurisdiction.
 
 Id.
 
 at 255, 112 S.Ct. 683;
 
 see also South Carolina v. Catawba Indian Tribe, Inc.,
 
 476 U.S. 498, 508-09, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). As the Court explained:
 

 “With the issue of the patent, the title not only passed from the United States but the prior trust and the incidental restrictions against alienation were terminated. This put an end to the authority theretofore possessed by the Secretary of the Interior by reason of the trust and restriction-so that thereafter all questions pertaining to the title were subject to examination and determination by the courts, appropriately those in Nebraska, the land being there.”
 

 Catawba Indian Tribe,
 
 476 U.S. at 508 n. 19, 106 S.Ct. 2039 (quoting
 
 Larkin v. Paugh,
 
 276 U.S. 431, 439, 48 S.Ct. 366, 72 L.Ed. 640 (1928)).
 

 Based on this language in the Indian General Allotment Act, courts have determined that “the protections of the Nonin-tercourse Act do not apply to land which has been rendered freely alienable by Congress, held by private parties, and subsequently acquired by an Indian tribe.”
 
 Cass Cnty.,
 
 643 N.W.2d at 696;
 
 see also Lummi Indian Tribe v. Whatcom Cnty., Wash.,
 
 5 F.3d 1355, 1359 (9th Cir.1993) (holding that “once Congress removes restraints on alienation of [Indian] land, the protections of the Nonintercourse Act no longer apply”);
 
 Mashpee Tribe v. Watt,
 
 542 F.Supp. 797, 803 (D.Mass.1982);
 
 Bay Mills Indian Cmty. v. State,
 
 244 Mich.App. 739, 626 N.W.2d 169, 174 (2001);
 
 Anderson & Middleton Lumber Co. v. Quinault Indian Nation,
 
 130 Wash.2d 862, 929 P.2d 379, 387 (1996);
 
 cf. City of Sher-
 
 
 *36
 

 rill, N.Y. v. Oneida Indian Nation of N.Y.,
 
 544 U.S. 197, 202-03, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005) (holding that the Oneida tribe could not “unilaterally revive its ancient sovereignty” over land “through open-market purchases from current titleholders” even though the land had previously been reservation land). Thus, once a tribe owns land in fee simple, the Nonin-tercourse Act provisions simply do not apply-
 

 In this case, there is nothing in the record to show that the land in question was ever held in trust by the federal government for the Tribe or any other Indian nation. And if it ever was, it was long ago fee-patented and held by private ownership. The record shows that the Tribe purchased one small parcel from a private individual and two larger parcels from a phosphate mining company. Since this land was purchased on the open market in fee simple, is not within the confines of the Tribe’s reservation, has apparently never been held in trust for the Tribe, and was privately owned for an extended period of time before the Tribe’s purchase, the provisions of the Nonintercourse Act simply do not apply to this land. Thus, the protections of the Nonintercourse Act do not preclude this eminent domain proceeding.
 

 Because we conclude that the trial court did not depart from the essential requirements of the law, we need not reach the Department’s suggestion that the Tribe’s argument is barred by the law of the case doctrine. We note that we denied without opinion the Tribe’s 2004 certiorari petition, in which it raised the identical sovereign immunity issue raised in this petition. However, “[a] simple denial of certiorari without opinion is not an affirmance and does not establish the law of the case.”
 
 Don Mott Agency, Inc. v. Harrison,
 
 362 So.2d 56, 58 (Fla. 2d DCA 1978). Therefore, our denial of that petition did not, as a matter of law, preclude the Tribe from raising this issue again in this second petition. Nevertheless, we do not see the wisdom in filing a successive certiorari petition raising an issue already reviewed and denied by this court in a prior petition when neither the facts of the case nor the law has changed in the interim.
 

 Denied.
 

 ALTENBERND and MORRIS, JJ., Concur.